EL PUEBLO DE PUERTO RICO, representado por REXFORD GUY TUGWELL, Gobernador de Puerto Rico, demandante y apelante, *v.* MANUEL ACEVEDO ROSARIO, demandado y apelado.

Núm. 9104.—*Sometido:* Junio 1, 1945. *Resuelto:* Diciembre 10, 1945.

*Hon. Procurador General Interino Jesús A. González, Fernando B. Fornaris, Procurador General Auxiliar, y Federico Tilén y Domingo Candelario, Asesor Legal y abogado éstos últimos, respectivamente, del Departamento del Interior, abogados todos del apelante; R. Cuevas Zequeira, abogado del apelado.*

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Después de practicada la prueba del demandante, la Corte de Distrito de San Juan declaró con lugar una moción de sobreseimiento (*nonsuit*) presentada por el demandado y desestimó la demanda. El demandante apeló y en este recurso sostiene que esta actuación fué errónea. Los hechos son los siguientes:

■■ El demandante celebró un contrato con el demandado el 30 de abril de 1941 para la construcción de un trozo de la carretera número 2 comprendido entre el puente de báscula y la entrada al Campamento Buchanan, conviniéndose que la obra se terminaría el 4 de mayo de 1942. En vista de que el contratista no iba a terminar la obra para dicha fecha y debido a que dicho trozo de carretera se necesitaba con urgencia para fines de la defensa nacional el demandante, por conducto del Comisionado del Interior, decidió rescindir el contrato y realizar la obra por administración y al efecto las partes convinieron en dicha rescisión a virtud de un contrato, redactado en inglés, que, en lo pertinente, dice así:

"That the Commissioner of the Interior, as party of the first part, and Manuel Acevedo Rosario, as party of the second part, do mutually agree and consent to the rescission of said contract in the manner and form stipulated *in the memorandum of February 5, 1942*, suscribed to by both parties.

"That the rescission of said contract is hereby agreed upon and accepted by both parties to the contract subject to the terms and conditions hereinafter set forth:

"1.—That the party of the first part, in the name and on behalf of The People of Puerto Rico, agrees to acquire by purchase from the party of the second part, for the sum of eighty thousand ($80,000) dollars all of the necessary equipment acquired by said party of the second part for the construction of said FAP 8-D (1) works, whether the same has been used or is available for future use in connection therewith, as per inventory marked 'Exhibit A' attached hereto and made to form part of this instrument.

"2.—That the party of the first part *shall make* settlement for and pay to the party of the second part, for all work executed up .

to and including *February 5, 1942,* in accordance with the computations *made* to that effect by the engineers and accepted by the party of the second part, on the basis of the unit price stipulated in the contract.

"3.—That the party of the first part shall make a just and reasonable settlement for all extra or additional works which may have been executed during the term the contract was in force.

"4.—That all rights or interest in or liability under the contract, shall cease between the parties *and the sureties thereto upon the execution of this instrument.*

"5.—That The People of Puerto Rico through its Department of the Interior shall take charge of the works and of their *execution as of February 6, 1942,* from which date and thereafter the party of the second part shall have no right to or intervention whatsoever with the equipment, works, personnel or with anything relating or pertaining to said contract.

"6.—The party of the first part shall cause to be returned to the party of the second part, such Workmen's Compensation Premiums as he may have paid pursuant to law, to which he may be entitled as a result of the rescission of the contract prior to the date fixed for its execution. As to any excise taxes which the party of the second part may have paid in connection with the execution of said contract, in case the party of the first part and the Treasurer of Puerto Rico should have no power to return said taxes, then the party of the first part promises to introduce a bill in the Legislature authorizing the return of such taxes as may correspond in proportion with the work not executed." (Bastardillas nuestras.)

Es importante hacer resaltar aquí las fechas que se mencionan en este contrato. Nótese que el contrato de rescisión fué otorgado el 17 de febrero de 1942 pero que en el mismo se hace constar que sus efectos se retrotraen al 5 de febrero de 1942 y que el demandante se hizo cargo de la obra al día siguiente, 6 de febrero.

La demanda en este caso se radicó casi un año después, o sea, el 4 de febrero de 1943 y, después de enmendada el día de la vista, en ella solicita el demandante que se condene al demandado a devolverle $41,260.55 que alega fueran pagados por el demandante por error incurrido en ciertos cómputos hechos por los ingenieros en relación con la cantidad

de material excavado por el demandado de ciertos cerros para hacer la obra de relleno en la carretera. Al analizar la prueba del demandante la corte inferior hizo constar en su opinión lo siguiente:

"Al comenzar la obra, el ingeniero Girod del Departamento del Interior hizo una mensura de los cerros, apuntando los datos en libretas, y preparando luego, a base de estos datos, planos o perfiles demostrativos de los contornos de los cerros antes de comenzar las excavaciones.

"Al terminar el demandado las excavaciones, se practicó otra mensura, por el ingeniero León del Departamento del Interior, y a base de esa mensura se trazaron nuevos perfiles demostrativos de los contornos de los cerros al terminar el demandado su obra. No existe, ni ha existido nunca, controversia en cuanto a la corrección de los planos hechos por León. La controversia surgió, al procederse a computar el terreno excavado *a los fines de fijar las bases* para el convenio de febrero 17 de 1942, en torno a los perfiles trazados por Girod. Los impugnó el demandado. Cuando los ingenieros fueron a constatar los planos de Girod con los datos de campo contenidos en las libretas, no encontraron las libretas. Un representante del demandado ofreció entonces unos datos que dijo eran copia de los contenidos en las libretas de Girod. Preparados los perfiles a base de estos datos, resultaban distintos de los de Girod y computado el terreno excavado a base de estos nuevos perfiles, resultaba un exceso de unos 70,000 metros cúbicos sobre la cifra arrojada al utilizar los perfiles de Girod, y un exceso de unos 50,000 metros cúbicos sobre la cantidad de material excavado depositado en la carretera.

"A pesar de estas discrepancias, *y en vista de la gran urgencia que revestía para el gobierno la transacción y liquidación de sus diferencias con el demandado*, el Departamento del Interior resolvió aceptar las cifras del demandado, haciéndolas suyas, y haciéndose constar que éstas representaban 'los cómputos hechos por los ingenieros y aceptados por' el demandado.

". . . . . . . . . . .

"No sabemos, ni las alegaciones ni la prueba nos lo dicen, si, de haberse cerciorado el Departamento del Interior de que los 'cómputos hechos por los ingenieros' eran erróneos, pudo el Departamento haber obtenido una transacción más favorable de la que obtuvo. En verdad que el 17 de febrero de 1942, el Departamento tenía en su poder todos

los datos que necesitaba para tener, por lo menos, la convicción moral, sino la certeza, *de que la reclamación del demandado por excavaciones era exagerada.* Sabía el Departamento que la cantidad que decía haber excavado el demandado se excedía en 50,000 metros cúbicos de la cantidad de material que según las certificaciones del Departamento había depositado el demandado en la carretera, y se excedía en unos 70,000 metros cúbicos de la cubicación hecha a base de los perfiles trazados por sus propios ingenieros Girod y León. Y sabía, o si no lo sabía pudo haberse enterado con una sola pregunta hecha a su ingeniero Girod, que los datos que suministraba el demandado no eran copia de los datos consignados por Girod en sus libretas, porque Girod nos dice que de esos datos no se hizo copia. Es perfectamente evidente que el Departamento aceptó los cómputos en que insistió el demandado, no porque los creyera correctos, *sino porque urgía al gobierno una transacción.''* (Bastardillas nuestras.)

El apelante señala, como único error cometido por la corte inferior al declarar con lugar la moción de *nonsuit,* el haber llegado a ''una conclusión equivocada al apreciar la prueba del demandante'' y arguye que esa conclusión es al efecto de que los cómputos de la obra ejecutada por el demandado apelado se habían hecho y el valor de dicha obra se había determinado por las partes al celebrarse el contrato de rescisión el 17 de febrero de 1942 y que tal valor previamente determinado había sido parte de la causa o consideración del referido convenio de rescisión. Partiendo de la corrección de esta conclusión entendió la corte que la acción incoada iba dirigida a obtener la restitución de parte de la causa o consideración del convenio, siendo la acción procedente una para anular dicho convenio ''por error que viciara el consentimiento de una de las partes.'' Arguye además el apelante que el error de la corte inferior consiste en haber interpretado erróneamente la cláusula segunda del contrato de rescisión en su frase *''in accordance with the computations made to that effect by the engineers and accepted by the party of the second part,''* y sostiene que cuando se firmó dicho contrato los cómputos no estaban hechos.

Creemos que la conclusión de la corte está sostenida por los términos del contrato y por la prueba.

Del contrato aparece, como hemos dicho antes, que si bien se firmó el 17 de febrero sus términos ya habían sido convenidos en un memorándum suscrito por las partes el 5 de febrero. Aunque dicho memorándum no fué presentado como prueba, nos parece que la cláusula segunda del contrato claramente indica que el pago había de hacerse de acuerdo con los cómputos hechos entre una y otra fecha y aceptados por el demandado. Además, la prueba demostró, como sostuvo la corte inferior, que el demandante, a pesar de que le constaba que existía una discrepancia en cuanto a los cómputos, pagó al demandado, no porque creyera que dichos cómputos eran correctos, sino porque aún creyéndolos erróneos, le urgía llegar a una transacción. Contestando a preguntas del juez de la corte inferior, dijo el testigo Angel Dos Silva, ingeniero del Departamento del Interior:

"P. ¿Y eso no les llamó la atención *antes de pagar?* R. Eso nos llamó la atención, pero como expliqué hace un momento la presión externa era tan grande que cualquier dilación iba a ser un daño o traer mayores protestas del público y de las fuerzas armadas; de manera que éste fué un trabajo que se hizo bajo una presión muy intensa. P. ¿Entonces ustedes se dieron cuenta de la diferencia *antes de que se pagara,* de esa notable diferencia entre lo que arrojaba la línea según los datos que daba Lugo y lo que aparecía entregado parcialmente, esa diferencia de cincuenta y pico de mil metros? R. *Sí, nos dimos cuenta de la diferencia."* (Bastardillas nuestras.)

Aún asumiendo, como sostiene el apelante, que los cómputos no se hubieren realizado cuando se firmó el contrato de rescisión, somos de opinión que lo esencial en este caso para que pudiera prosperar la acción ejercitada por el demandante es que al momento de hacer el pago al demandado lo hubieran efectuado por error de hecho, ya que se trata de una acción en cobro de lo indebido que, de acuerdo con el artículo 1795 del Código Civil, procede "Cuando se recibe alguna cosa que no había derecho a cobrar, y que por error

ha sido indebidamente entregada, . . . ''. Interpretando el alcance de este artículo hemos resuelto, después de citar autoridades y jurisprudencia, que " . . . . para que exista el cuasicontrato de cobro de lo indebido, es necesaria la concurrencia de dos requisitos, a saber: 1°., que se pague indebidamente, y 2°., que se haga el pago por error o equivocación y no por mera liberalidad o por cualquier otro concepto. El error que da origen al cuasicontrato, debe ser de hecho y no simplemente de derecho.'' *American R. R. Co. of P. R.* v. *Wolkers,* 22 D.P.R. 283, 288.

Comentando Sánchez Román este cuasicontrato, dice:

"Es, por consecuencia, indispensable fundamento de este cuasi contrato, el indicado error de hecho en el que paga; pues si pagó indebidamente *á sabiendas de que no debía* ó pagó con certeza en el hecho, pero error en el Derecho por no ser la deuda civilmente exigible, por ejemplo, lo debido en virtud de una obligación natural, no existe cuasi contrato de pago de lo indebido, ni puede, por tanto, reclamar su devolución, reputándose que tuvo intención de donar.'' (Bastardillas nuestras.)  *Derecho Civil,* Tomo 4, pág. 1004.

En el caso de autos, como hemos dicho, el demandante pagó a sabiendas de que el error existía e inducido a ello por las razones de urgencia que explicó. No se pagó por error de hecho sino "por mera liberalidad o por cualquier otro concepto,'' es decir, debido a la urgencia del caso con motivo de la emergencia de guerra.

Como dicen Colín y Capitant:(¹) " . . . cuando el pago indebido se efectúa a sabiendas de que el supuesto acreedor no tenía derecho a percibirlo, sale el hecho de la esfera propia del cuasicontrato para entrar de lleno en otro orden de relaciones jurídicas.''

*Debe confirmarse la sentencia apelada.*